# EXHIBIT
# K

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA (FRESNO)

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | Case No.: 1:23-CR-00219-NODJ-BAM |
| vs. | Fresno, California |
| JIA BEI ZHU, ALSO KNOWN AS JESSE ZHU ALSO KNOWN AS QIANG HE, ALSO KNOWN AS DAVID HE, Defendant. | Wednesday, July 17, 2024 2:02 P.M. |

TRANSCRIPT OF HEARING ON MOTION FOR BAIL REVIEW
APPEAL OF DETENTION ORDER
BEEFORE THE HONORABLE DALE E. DROZD
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES ON NEXT PAGE.

Electronic Court Recording Operator: Otilia Rosales
United States District Court
Robert E. Coyle United States Courthouse
2500 Tulare Street
Fresno, California 93721

Transcription Service: Liberty Transcripts
9107 Topridge Drive
Austin, Texas 78750
(847) 848-4907
DBPATEL1180@GMAIL.COM
www.libertytranscripts.com

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES:

| | |
|---|---|
| For the Government: | United States Attorney's Office<br>BY: JOSEPH BARTON, ESQUIRE<br>2500 Tulare Street, Suite 4401<br>Fresno, California 93721<br>(559) 497-4000<br>joseph.barton@usdoj.gov |
| For the Defendant: | Law Offices of Anthony P. Capozzi<br>BY: ANTHONY P. CAPOZZI, ESQUIRE<br>1233 West Shaw Avenue, Suite 102<br>Fresno, California 93711<br>(559) 221-0200<br>anthony@capozzilawoffices.com |
| For the Mandarin Interpreter: | Simon Wong |

**FRESNO, CALIFORNIA, WEDNESDAY, JULY 17, 2024, 2:02 P.M.**

THE CLERK: Please remain seated. Court is back in session. The Court calls Item Number 19 on the calendar, 1:23-CR-00219, United States versus Jia Bei Zhu, set for a Motion For Bail Review Appeal of Detention Order.

THE COURT: The Banda case, by the way, is going to go last. I don't know whether I can sentence that case today or not. Well find out, but it's going last no matter what.

Please state your appearances beginning with Counsel for the Government.

MR. BARTON: Good afternoon again, Your Honor.

Joe Barton for the Government.

MR. CAPOZZI: Your Honor, Tony Capozzi for the Defendant David He, who is present in court in custody.

THE COURT: And, Mr. Interpreter, your appearance, please.

THE INTERPRETER: My name is Simon Wong, W-O-N-G. I'm a court interpreter in the Mandarin (indiscernible), Your Honor.

THE COURT: Thank you.

THE INTERPRETER: Thank you.

THE COURT: All right. This is the case where the few of the cases that are left over from this very long calendar. I will be candid when I say I have read the Appeal from the Detention Order, the Government's Opposition,

skimmed the Pretrial Services Report, read the Reply of the Defense that was filed yesterday, have not read any transcripts, haven't had time, too many cases, too much to read.

MR. CAPOZZI: I agree with the Court. It's a short period of time. I have no objection to another date.

THE COURT: No.

MR. CAPOZZI: Okay.

THE COURT: I just want to tell you what I've focused on and what I haven't.

MR. CAPOZZI: Okay.

THE COURT: So based upon what I understand of the situation, how -- this case was indicted in 2023. How much time has the Defendant been in custody so far?

MR. CAPOZZI: Since that date. Prior to that date, October of 2023.

MR. BARTON: About eight months, Your Honor.

THE COURT: Okay.

MR. BARTON: Eight months, eight, nine months.

MR. CAPOZZI: Eight to nine months.

THE COURT: Okay. Is there a trial date set?

MR. CAPOZZI: No.

MR. BARTON: No, Your Honor. But that's been at Defense's request to continue.

MR. CAPOZZI: And we're more than happy to set a

trial date. He wanted to have this hearing first before a trial date was set.

THE COURT: Of course, the question of whether the Court has a Judge that can preside over that trial is another question.

MR. CAPOZZI: And I'm in trial throughout the rest of the year.

THE COURT: I'll ask you both, but Judge Grosjean heard the last Motion For Bail Review, and that was when Pretrial Services Officer Beckwith recommended release on a very large bond. Judge Grosjean denied the Motion apparently because of flight-risk concerns, as I understand it, having to do with claims of non-disclosure of assets, perhaps some questions regarding the collateral that was being offered to be posted, the various names associated with the Defendant.

I don't know whether the fact of his partner and their newborn from the country played a role in the determination or not. Was there anything else that Magistrate Judge Grosjean was concerned about?

MR. BARTON: I believe, yes, the Defendant's, the fact that his newborn son and wife, they did not disclose those to Pretrial Services played a role in it. Then, Judge Grosjean was also concerned that he lacks any real tie to the community. His family is in China or New Zealand. His proposed custodians were attorneys or business contacts that

he had known for not all that long. He didn't seem to have a personal relationship with them. I believe they're both in L.A.

So essentially, he'd have third-party custodians that, I believe her concern was that that wouldn't really be able to watch him or have any meaningful type of supervision. So I think that was the last bucket that Judge Grosjean was concerned about.

THE COURT: Now, Mr. Capozzi in his Reply Brief, the Government in their Opposition talks about -- and to me, this is relevant. The Government talks about an eight-year term of imprisonment. I assume that's based upon statutory maximums.

MR. BARTON: Correct, Your Honor.

THE COURT: So that's unlikely to --

MR. BARTON: Well, if I may qualify that, Your Honor. It is statutory maximums, yes, but also the loss amount. Well, the individual accounts for the misbranding can have three years. The guideline here, the Government has got the loss approximately today at about 2.5 million. So if you -- you'd have -- to get a guideline sentence, you'd have to stack a couple of the misbranding counts and then you have the 1001 count.

So the Government -- in the Government's estimate, eight years is a realistic sentence.

THE COURT: So you disagree with Mr. Capozzi's guideline proposal that, at the worst, this is a -- even if the Defendant were convicted of all charges, this is a Level 16 offense with a lack of criminal history, resulting in a guideline range under the Advisory Sentencing Guidelines at the worst of 21 to 27 months. The Government disagrees?

MR. BARTON: Yes, Your Honor. The Government strongly disagrees. The loss, this is -- we've traced the loss based on financial records, assuming the Government were to prevail at trial, of companies that purchased COVID test kits, $2.5 million went into the coffers of Mr. Zhu's companies based on those sales, which the Government is alleging were illegal and unauthorized.

That would put a significant loss amount and significantly raise the offense level, as the Court well knows, to quite a degree. And, plus, you have a ten-or-more victim enhancement. There are, I believe, well over 10 if not 20 to 30 victims who bought the test kits. So with those enhancements, the Government believes an eight-year sentence is quite realistic for the Defendant.

THE COURT: I am concerned, obviously, if the Detention Orders were to arguably result in someone remaining in custody longer than the sentence that they would be likely to receive even if they went to trial and were convicted. I mean, that is a legitimate concern.

It's hard for me to assess in a vacuum. I mean, you two have very different views about what the realistic exposure in this case are.

MR. CAPOZZI: If I may?

THE COURT: Sure.

MR. CAPOZZI: Are there conditions that would reasonably assure his appearance? He's applied for asylum in the United States. He doesn't want to go back to China. If he did, I think he'd be in deep trouble. He has a Chinese passport. He has a driver's license from Las Vegas. And the collateral is in Las Vegas. He would live in Las Vegas. His third-party custodians are in Las Vegas. One is his longstanding attorney because his family is gone, and the other is his property manager of the properties his wife owns in Nevada.

I think there's substantial collateral, a million and something. I forgot what the number was.

THE COURT: The Government just told me that the third -- the proffered third-party custodians are in Los Angeles --

MR. CAPOZZI: They're not.

THE COURT: -- not in Las Vegas.

MR. CAPOZZI: They're in Las Vegas.

MR. BARTON: He's proposed multiple custodians, Your Honor.

MR. CAPOZZI: I'm sorry?

MR. BARTON: He's proposed -- I believe he's proposed three different custodians since he's been --

MR. CAPOZZI: No, there's two. It's Mr. Lynn (phonetic), his attorney, and Ari Solomon (phonetic), both in Las Vegas.

MR. BARTON: I believe there was another

MR. CAPOZZI: (Indiscernible attorney.

MR. BARTON: I believe there was another custodian that he initially proposed.

MR. CAPOZZI: That was the first time. He lived in Southern California, so.

MR. BARTON: There was a --

MR. CAPOZZI: We'll use him too, if we could. But because he lives in Las Vegas, we just went to Las Vegas. And there's no reason for him to run.

THE COURT: Well --

MR. CAPOZZI: The Government talks about eight years but, Judge, the Indictment, and what I set out is what the Indictment says, that there's two sales of kits that the Government alleges were not finalized. One was for 200,000; one was for 36. And I did the Guidelines on it. It's a $236,000 loss. And I set out the Guidelines. That's exactly what it is.

Now the Government gives this pie in the sky about

all these other things. Show some proof. They don't have it, and there's no need for him to run. He's filed a civil rights lawsuit from getting beat up when he was arrested. They went and took his warehouse and destroyed everything in it, and there's a lawsuit for that. Why leave?

THE COURT: Well, the fact that he's got a lawsuit, the civil rights lawsuit pending doesn't impress me too much as far as establishing ties to the community.

MR. CAPOZZI: Understand.

THE COURT: He's now been charged with a criminal offense.

MR. CAPOZZI: Yeah. But it's --

THE COURT: A serious federal criminal offense. He's obviously got ties to China. His partner and their child are now there.

MR. CAPOZZI: Right.

THE COURT: What about this bond that's being proposed? Who's posting it?

MR. CAPOZZI: It would be his company.

THE COURT: And what is their relationship to him?

MR. CAPOZZI: And that's, again, that's his partner, his wife, owns this. David Destiny (phonetic), Dizzy David Destina (phonetic). And they own the properties in Las Vegas. There's one property here in Clovis. It's a rental property. I think the value is 750 to 850 thousand. The

ones in Las Vegas, the one in Las Vegas is worth about the same. I think it's a million-two.

Now there's another property in Las Vegas. We could put that up, too. We were trying to get a loan on that, but we will hold off getting a loan and put that up as collateral, and that will add up to two million.

THE COURT: Who owns that?

MR. CAPOZZI: The same as this, his partner, his wife.

MR. BARTON: What property is this?

MR. CAPOZZI: They're not married.

MR. BARTON: What property is that, Tony?

MR. CAPOZZI: They're right next to each other.

MR. BARTON: What's the address?

MR. CAPOZZI: I don't know the address off the top of my head.

MR. BARTON: The Government is -- I mean, to Mr. Capozzi's point, two of the properties that the Defendant and his wife and his company owns just went for sale. One has closed and one is in escrow, total about $900,000 for those two properties.

MR. CAPOZZI: And we'll pull the sale on the extra one and put that up or post that money. That is substantial collateral.

MR. BARTON: And, Your Honor, if I know the Court's

got a lot going on it, the Government does want to address this asylum story. As set forth in the Government -- in Mr. Zhu's Bail Review, Bail Appeal Motion, the Government -- there is strong proof he's not telling the truth. This asylum application is false. It's got false -- demonstrably true falsehoods.

The Government has the application. We're happy to file it. We can file it under seal. Defense Counsel was asked to sign a waiver allowing the Government to show it in open court. Defense wouldn't sign that waiver. That asylum application has numerous falsehoods about Mr. Zhu, about prior names used, about family connections, about his prior travels to the United States, all lies.

He is an incredible flight risk.

MR. CAPOZZI: I submitted that to my Motion first time up, his asylum application. I just don't think it should be out to the public. It's fine for the Court. I have no problem with the Court looking at it. It's signed under the name David He, Qiang He, where he legally changed his name.

The question is whether or not he's going to show up.

MR. BARTON: And, Your Honor, on that point, if I may, the last biggest point the Government wants to emphasize is that Mr. Zhu, as his story would have it, is that at some

point, he changed his name from Jia Bei Zhu or Jesse Zhu to Quiang He while in China, and that he came to the United States or came to Canada for the first time in 2020 just to go into the United States. And then when he got into the United States, he applied for asylum. That's not true.

He has the Chinese passport for Qiang He was issued in 2011. The Defendant, Jia Bei Zhu, has a Canadian passport and a Canadian driver's license -- the driver's license was found at the search warrant -- that were issued in 2013, 2014 under the identity of Jia Bei Zhu. Since 1997, the Defendant has crossed the Canadian border into the U.S. under the name Jia Bei Zhu 40 times, and he's been stopped at least two times with what I could generally describe as stuff related to the healthcare pharmaceutical industry. At times, he was illegally in the country and asked to leave saying he needed a work visa. Other times, he's able to obtain or at least apply for a work visa and stay here for a little bit.

So this story that the Defendant changed his name from Zhu to He in China and then came to Canada in 2020 just to make his way to the United States and apply for asylum, absolutely not true. He's been operating under two identities for over a decade. And to the Government, there is -- that's an incredible flight risk.

MR. CAPOZZI: He has legal documents that I submitted to the Court changing his name from Qiang Lee to

David Lee -- He, not Lee. And then it was changed in China. I can't get those papers. People who knew him as Jia Bei still call him that. There aren't that many people here that know him by that name. They know him as David He.

Now he's come back over the border because he has business here. He had a business in Fresno. When that lease ran out, they moved the business down to Reedley just for a warehouse. They were building a new building here, a multi-million-dollar building that was being built here for his warehouse. He had a -- prior to coming to Fresno, they were in Tulare County.

So he's got businesses here. They were doing very well. The warehouse in Reedley was found to be not meeting up to code, and that's when they were searched and that's where all of his equipment and all of the animals were destroyed. No reason to run, especially when he's done as much time as he has.

MR. BARTON: Your Honor, I mean, Mr. Zhu contends that he legally changed his name from Zhu to Qiang He in China, but he can't produce the documentation. All the stuff the Government just proffered to the Court, we have the documents here. We can show them to the Court. He had dual identities for over a decade that he's using legal documents authorized by Canada and the United States.

And then he files for asylum and he lies about it

all. When he applied for asylum, he disclosed nothing about his Canadian passport, his time in Canada, none of that.

MR. CAPOZZI: Because they're all expired. The only passport that's good is the Chinese passport in the name of Qiang He and the driver's license is David He.

MR. BARTON: That's not true. The Canadian passport expired September 2023.

MR. CAPOZZI: Are there conditions to reasonably assure his appearance? I submit there are --

THE COURT: And I'm not convinced of that as of yet.

MR. CAPOZZI: I'm sorry, Judge?

THE COURT: I am not convinced of that as of yet. I am obviously concerned. It sounds as if the judges who have heard this matter before came up to me, I'm obviously concerned about the use of multiple names.

The Government has also said, oh, we want to talk about that Order that the Defense submitted and you signed. I signed that Order only for purposes of allowing money to be placed on the Defendant's books where he's being retained.

MR. BARTON: Understood.

THE COURT: If all the names need to be listed in one way or another, the only basis that -- I mean, that Order was routed to me by well-meaning courtroom deputies thinking that it was merely a ministerial task. If you didn't have a chance to oppose it, that's why. It got submitted. It was

immediately forwarded to me. I get hundreds of orders a week.

It didn't appear to me to be significant. I signed off on it. I signed off on it only to allow what Mr. Capozzi represented was, look, this is causing a problem with him getting anything put on the books at his place of confinement under that name. If we need to modify that in some way that satisfies everybody, happy to modify it.

In terms of detention, I'm obviously concerned with the use of multiple names. And I'm not going to be able to figure out here listening to the two of you playing ping pong over what's expired, not expired, what's this, what's that. No, I'm not going to -- I can't. I can't resolve that today --

MR. CAPOZZI: I'll be glad to submit that.

THE COURT: -- and I'm not going to.

Number two, what is the real exposure in this case? Is it the Government's statutory maximum, because the Guidelines are going to exceed the statutory maximum? It sounds to me like they're arguing based upon relevant conduct, not based upon charged conduct. Or is it going to be limited to the charges?

I don't know. I've never even opened this docket before. I had no knowledge of this case until I showed up here this morning.

Three, what's the collateral that's being proposed? Who actually controls it? Is it the Defendant himself essentially so that all this is, is, well, he profited by millions of dollars in fraud and, therefore, this is just the cost of doing business to put up property that he's managed to acquire as a result of his allegedly fraudulent activities and, therefore, it really does not tie him at all?

Normally, of course, what the Court is looking for is somebody very close to a criminal defendant who says, I believe them so much I'm willing to put up the roof over my head. I'm absolutely confident they're not going to flee and, therefore, I'll put my home on the line where I live. Does that -- I mean, the Court usually presumes, A, that that's a very serious matter for people to expose themselves like that and I should take it very seriously and, two, that most somewhat rational human beings would say to themselves, gee, I would love to have run but I can't because somebody really close to me has their home on the line and I just can't do that to them.

Now, of course, not everyone's rational. And some people are more selfish than others and, therefore, sometimes people do despicable things. But generally, the Court is impressed by property to be even put by others that are close to the individual. As opposed to, oh, my life partner who just gave birth to our child and then exited for China and

isn't planning on returning, yeah, that's their property that they posted. Well, that doesn't sound all that solid to me, no matter how much it's worth. Less impressive than my mother's putting up her home that she lives in and I wouldn't possibly do that to my mother.

Now, anyway, I'm just giving you guidelines. I'll hear this again and I'm not saying that I can conceive of no possible conditions. I mean, yeah, it would have to entail electronic monitoring. It would have to include a significant bond.

It would have to include third-party custodians who have a close enough relationship to the Defendant who sign declarations saying I understand what my obligations as a third-party custodian would be, I will check on the Defendant on a daily basis. We have a close enough relationship already that I do that anyway, and I understand that if I become aware of the Defendant violating any condition of his pretrial release, I must immediately notify Pretrial Services. I would want that buttoned up.

All of those things are relevant to me. Right now, this is a hodgepodge. I can't really tell what I've got in front of me. Of course, the other -- I mean, I would hear it again. I at least have some knowledge now. The problem is I'm about to start a trial in Sacramento, and I doubt I'm going to be here for a while. I don't know whether a Motion

Case 1:23-cr-00219-NODJ-BAM Document 76 Filed 08/10/24 Page 19 of 20


For Bail Review is something that we can be allowed to do remotely.

I think we might be able to under the Federal Rules of Criminal Procedure. If so, I would certainly conduct a further hearing if the Defense said, okay, Judge, we heard you at the hearing, here's our proposal and here's full support for it. But because I'm not satisfied with respect to all of those things as of yet, I am going to deny the Motion For Bail or Appeal of the Detention Order, Review of the Detention Order, but it is denied without prejudice to renewal if you think you can address some of the concerns I have.

MR. CAPOZZI: I feel very confident about that. And I don't have any problem coming to Sacramento. I have other cases in state court in Sacramento I could coordinate with the Court.

THE COURT: Okay.

MR. CAPOZZI: And --

THE COURT: Anything, Mr. Barton, you wanted to add? I've commented about the name situation. I didn't mean to do anything that the Government --

MR. BARTON: No.

THE COURT: I didn't know the Government opposed.

MR. CAPOZZI: Nor did I. Nor did I.

MR. BARTON: No, Your Honor. That clarification by

Case 1:23-cr-00219-NODJ-BAM Document 76 Filed 08/10/24 Page 20 of 20


the Court is perfect.

THE COURT: All right.

MR. BARTON: Thank you.

MR. CAPOZZI: Okay, good.

THE COURT: All right. Denied without prejudice.

MR. CAPOZZI: Yeah. Thank you, Judge.

(Whereupon, at 2:28 p.m., the hearing was adjourned.)

* * * * *

C E R T I F I C A T I O N

I, DIPTI PATEL, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and is transcribed to the best of my ability.

DIPTI PATEL, AAERT CET-997

Expires: December 6, 2026

LIBERTY TRANSCRIPTS DATE: August 9, 2024