ANTHONY P. CAPOZZI, SBN: 68525
LAW OFFICE OF ANTHONY P. CAPOZZI
1233 West Shaw Avenue, Suite 102
Fresno, California 93711
Telephone: (559) 221-0200
Facsimile: (559) 221-7997
E-Mail: anthony@capozzilawoffices.com
www.capozzilawoffices.com

Attorney for Defendant,
DAVID HE

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

*****

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>JIA BEI ZHU aka Jesse Zhu, Qiang He, and David He,<br>Defendant. | CASE NO.: 1:23-CR-00219-DAD-EPG<br><br>**MOTION FOR NEW TRIAL PURSUANT TO RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE** |

Defendant, DAVID HE, by and through his attorney of record, Anthony P. Capozzi, moves for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure based upon the following issues:

1) The government failed to meet its burden that the defendant was not prejudiced by comments of Juror No. 9; and

2) The district court erred in allowing 404(b) evidence of Dr. Adam Ruben's testimony regarding Canadian company, IND.

# I

# THE GOVERNMENT FAILED TO ESTABLISH THAT THE DEFENDANT, DAVID HE, WAS NOT PREJUDICED BY THE COMMENTS MADE BY JUROR NO. 9 TO THE OTHER JURORS AFTER HAVING BEEN SWORN TO HEAR THE CASE

## FACTUAL BACKGROUND

On April 21, 2026, voir dire was conducted with the prospective jurors in this case. During the selection process, the court, government, and defense counsel questioned prospective jurors regarding their backgrounds, circumstances, and ability to serve on the jury panel. The Court and counsel ultimately completed the selection of a twelve-person jury with three alternative jurors. Juror No. 9, previously Juror No. 18 in the gallery, was selected as one of the members serving on the jury. The courtroom deputy swore in all members of the jury before evening recess, **(EXHIBIT A) – RT of Trial Day 1 (4/21/2026), 192:1-2**.

On the morning of April 22, 2026, outside the presence of the jury, the Court and counsel discussed a letter of communication the court received, **(EXHIBIT B) – Letter submitted by Juror 9, DOC # 180**, from Juror No. 9.

Juror No. 9 had represented his belief of "illegal aliens not having the same rights" and conclusion of Defendant's citizenship status based on the following:

(a) Not one but two translators

(b) Not confirming or denying defendant's citizenship status

(c) Revealing defendant is from China

(d) Wire fraud to China (?)

Juror No. 9 expressed his inability to be fair and impartial based on being a conservative person in ideology and personal behavior, in addition to his belief that

illegal immigrants are not entitled to the same rights as American citizens.

The court and parties agreed that Juror No. 9 be excused.

In the presence of the jury, the Court asked Juror No. 9 whether he had sent a note to the Court that morning. Juror No. 9 confirmed that he had. The Court informed him that, after discussing his note with counsel, he was excused for cause, **(EXHIBIT C) – RT of Trial Day 2 (4/22/2026), Page 211:22-25; Page 212:1- 7**.

Following the excusal of Juror No. 9, during sidebar conversation, defense counsel requested that the Court ask the remaining jury members whether Juror No. 9 discussed his personal views with anyone else, **(EXHIBIT C) – RT of Trial Day 2 (4/22/2026) Page 212:20-25; Page 213:1-6**.

The Court then requested that the members of the jury, by a show of hands, indicate whether anyone had heard Juror No. 9 state, "…that he was planning on communicating with the Court and/or the contents of the communication that he was going to send to the Court," **(EXHIBIT C) – RT of Trial Day 2 (4/22/2026) Page 213:8-14**.

The Court then limited its inquiry to Juror Nos 7 and 8 after their indication by a raise of hand that they had been in communication with Juror No. 9.

The Court first questioned Juror No. 7, outside the presence of the remaining jurors, who stated that Juror No. 9 had entered the jury room that morning and said he was going to recuse himself. However, Juror No. 7 had no knowledge of why he intended to do so, **(EXHIBIT C) – RT of Trial Day 2 (4/22/2026) Page 214:2-22**.

The Court then questioned Juror No. 8, separately from Juror No. 7 and other members of the jury. Juror No. 8 stated that, on the previous day, Juror No. 9 had asked whether Defendant was an "illegal alien" and had expressed that he was upset about being part of a trial where the person "might not even be a U.S. citizen," **(EXHIBIT C) – RT of Trial Day 2 (4/22/2026) Page 215:5-25;Page 216; Page 217; Page 218; Page 219:1-22**.

The Court inquired whether the views of Juror No. 9 were shared with

anyone else, to which Juror No. 8 advised the Court of Juror No. 7 and Courtroom Deputy Pete Buzo's presence in the jury room when Juror No. 9 made mention of Defendant's citizenship status, **(EXHIBIT C) – RT of Trial Day 2 (4/22/2026) Page 216:9-25; Page 217:1-5**.

Defense counsel asked Juror No. 8 as to where Juror No. 9 made these comments, and who was present, **(EXHIBIT C) – RT of Trial Day 2 (4/22/2026) Page 218:12-24**.

Juror No. 8 responds that all jury members were in the jury room when Juror No. 9 inquired about Defendant's citizenship status, **(EXHIBIT C) – RT of Trial Day 2 (4/22/2026) Page 218:23-24**.

The Court then asks Juror No. 8 whether they think the other jurors heard Juror No. 9's commentary, since no other jurors indicated that they had heard anything, **(EXHIBIT C) – RT of Trial Day 2 (4/22/2026) Page 218:25; Page 219:1**.

Juror No. 8 advises the Court that they don't think anybody else processed that Juror No. 9's inquiry was part of his reasoning to communicate with the court or not wanting to serve on the jury. When Juror No. 8 was asked by the Court if this was Juror No. 8's impression of Juror No. 9's not wanting to serve as a juror, Juror No. 8 said Juror No. 9 had evident feelings of upset, however, they were making "inferences", because they "make inferences all the time," **(EXHIBIT C) – RT of Trial Day 2 (4/22/2026) Page 219:2-22**.

Outside the presence of the jury, defense counsel requested the Court to voir dire the jury again based upon what Juror No. 9 said in the jury room, what the other jurors heard, and if anyone has any feelings of whether an "illegal alien", has the same rights as U.S. citizens, **(EXHIBIT C) – RT of Trial Day 2 (4/22/2026) Page 220:4-14**.

Subsequently, in the presence of the entire jury, the Court requested an indication from the jurors who were exposed to comments made by Juror No. 9,

regarding his views of certain subjects. The record reflects all, but three jurors indicated exposure to Juror No. 9's commentary, **(EXHIBIT C) – RT of Trial Day 2 (4/22/2026) Page 220:17-25; Page 221:1**.

While the entire jury was present in the courtroom, the Court asked Juror No. 10 questions, who said she ignored Juror No. 9 and didn't pay attention to him, **(EXHIBIT C) – RT of Trial Day 2 (4/22/2026) Page 221:3-13**.

The Court then advised the jury that Juror No. 9 expressed his own personal views regarding citizenship, the rights of immigrants in this country, his military background of service, his views regarding the COVID-19 pandemic, **(EXHIBIT C) – RT of Trial Day 2 (4/22/2026) Page 221:16-23**. The Court went on to say that "It sounds as if almost all of you heard him say some of these things in the very brief time since this jury was selected and sworn in late yesterday afternoon."

The Court went on to determine of any juror's ability to serve as a fair and impartial juror, **(EXHIBIT C) – RT of Trial Day 2 (4/22/2026) Page 221:23-25; Page 222; Page 223:1-8**.

After no indication from the jurors, defense counsel requested the Court to question each individual juror what they heard from Juror No. 9. The Court denied to do so, **(EXHIBIT C) – RT of Trial Day 2 (4/22/2026) Page 223:9-12**.

The Court did ask the jurors if anyone heard other comments from Juror No. 9 regarding topics other than citizenship, the rights of immigrants, his views regarding COVID-19 – in a broad sense – and his military background, **(EXHIBIT C) – RT of Trial Day 2 (4/22/2026) Page 223:14-25; Page 224:1-3**.

At that point, defense counsel requested to approach for a side bar and requested that the court ask about evidence that the defendant was seeking asylum and whether that would change anybody's view about how they would look at this case, especially now with the immigrant question coming up.

The government objected and the Court denied the request, **(EXHIBIT C) – RT of Trial Day 2 (4/22/2026) Page 224:4-25**.

## STANDARD OF REVIEW

United States v. Sanchez, 175 F.4th 1134, 1144 (9th Cir. 2026) states in pertinent part:

> "We review a district court's…denial of a new trial on the assertion of juror misconduct or bias for abuse of discretion…" *United States v. Smith,* 424 F.3d 992, 1011 (9th Cir. 2005). In this Circuit, we have adopted "a two-part test to determine objectively whether a district court has abused its discretion in denying a motion for a new trial." *United State v. Hinkson,* 585 F.3d 1247, 1261 (9th Cir. 2009) (en banc). "The first step…is to determine de novo whether the trial court identified the correct legal rule to apply to the relief requested." *Id.* at 1261-62. "If the trial court failed to do so, we must conclude it abused its discretion." *Id.* at 1262. "If the trial court identified the correct legal rule, we move to the second step…" *Id.* "[T]he second step of our abuse of discretion test is to determine whether the trial court's application of the correct legal standard was (1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.'" *Id.* (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 577 (1985)). "A district court abuses its discretion where it…relies on an improper factor, omits a substantial factor, or engages in a clear error of judgment…" *Senne* v. Kan. City Royals Baseball Corp., 934 F.3d 918, 926 (9th Cir. 2019).

## STATEMENT OF THE LAW

In Remmer v. United States, 347 U.S. 227, 74 S. Ct. 450 (1954), after the jury returned its verdict, Remmer learned that during the trial, a person communicated with a juror that he could profit by bringing in a verdict favorable to Remmer. The incident was reported to the judge and the prosecuting attorneys. The Federal Bureau of Investigation (FBI) was brought in to investigate. The FBI report was considered by the judge and prosecutors that the statement was made, injest. Neither Remmer nor his attorney were aware of the incident until reading it in the newspapers. at 450.

A motion for new trial alleging that Remmer was prejudiced, depriving him of a fair trial was submitted, and a requested hearing to determine the circumstances

surrounding the incident and its effect on this jury. at 450.

The Court stated: at 451

> "In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." *Mattox v. United States*, 146 U.S. 140, 148-150; *Wheaton v. United States*, 133 F.2d 522, 527.

The Court went on to state: at 451

> "We do not know from this record, nor does the petitioner know, what actually transpired, or whether the incidents that may have occurred were harmful or harmless. The sending of an FBI agent in the midst of trial to investigate a juror as to his conduct is bound to impress the juror and is very apt to do so unduly. A juror must feel free to exercises his functions without the FBI or anyone else looking over his shoulder. The integrity of jury proceedings must not be jeopardized by unauthorized invasions. The trial court should not decide and take final action *ex parte* on information such as was received in this case, but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate."

The *Remmer* case was again before the Supreme Court in *Remmer v. United States*, 350 U.S. 377, 76 S. Ct. 425 (1956), with the question of the effect of the extraneous communications with a juror upon the petitioner's right to a fair trial. at 426. The lower court found that the FBI agent's discussion with the juror had "no effect whatsoever upon the judgment, or the integrity, or state of mind" of the juror concluding that the incident was harmless which conclusively dispelled any presumption of prejudice. at 426.

The Supreme Court, in *Remmer II* case, stated that the entire picture should have been explored by the district court by examining what took place during the

have been explored by the district court by examining what took place during the contact with the juror, the impact on the juror then, immediately thereafter and during the trial, taken together with the fact that the FBI was investigating a circumstance involving a juror and the fact the juror never knew throughout the trial, the outcome of the investigation. at 426.

The court specifically stated in *Remmer II*: at 426

> "In a criminal case, any private communication, contact, or tampering directly or indirectly with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed **presumptively prejudicial**, (emphasis added) if not made in pursuance of known rules of the court…with the knowledge of the parties." citing *Remmer*, 347 U.S. at 229.

The *Remmer II* Court at 76 S. Ct. 427, ultimately concluded that the evidence revealed that neither the juror nor anyone else could say he was not affected in his freedom of action as a juror. He had been subjected to extraneous influences on which no juror should be subjected, for it is the law's objective to guard jealously the sanctity of the jury' right to operate as freely as possible from outside unauthorized intrusions purposely made. at 427.

**The Court remanded the case with directions to grant a new trial**.

In Godoy v. Spearman, 861 F.3d 956 (9th Cir. 2017), a juror allegedly kept in contact with a "judge up north" and passed this information to other jurors during the trial. This raised a presumption that the defendant was prejudiced. However, the court concluded that the presumption was rebutted because actual prejudice was not proven. The trial court did not hold a hearing to determine whether prejudice in fact occurred. at 959.

The California Appellate Court affirmed the conviction and the Supreme Court of California denied review. at 961.

A federal habeas petition was filed raising the same arguments which the

federal district court denied. at 961.

The *Godoy* Court adopted the following framework: at 962

> "When a defendant alleges improper contact between a juror and an outside party, the court asks at step one whether the contact was "possible prejudicial." Mattox, 146 U.S. at 150. If so, the contact is "deemed presumptively prejudicial" and the court moves to step two, where the "burden rests heavily upon the [state] to establish" the contact was actually "harmless." Remmer, 347 U.S. at 229. If the state does not prove harmlessness, the court sets aside the verdict. When the presumption arises but the prejudicial effect of the contact is unclear, the trial court must hold a "hearing" to determine the circumstances [of the contact], the impact thereof upon the juror, and whether or not it was prejudicial." *Id.* at 229-30.

The *Godoy* Court cited Remmer, 347 U.S. at 228 which again stated:

> "In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed *presumptively prejudicial*, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the *burden rests heavily upon the Government* to establish, after notice to and hearing of the defendant, that such contact with the juror was *harmless* to the defendant. *Id.* at 229 (emphasis added) (citing Mattox, 146 U.S. at 148-150. Beyond its restatement of the presumption of prejudice, *Remmer* established that once the presumption of prejudice arises, the court must hold a "hearing" – at which the state bears the burden – to "determine the circumstances [of the contact], the impact thereof upon the juror, and whether or not it was prejudicial." *Id.* at 230; see *id.* at 229.

The *Remmer II* Court made it's reasoning even more plain stating that:

> "When the case returned to it after remand, explaining that "it was the *paucity of information* relating to the entire situation *coupled with* the *presumption* which attached to the kind of facts alleged by petitioner which, in our view, made manifest the need for a full hearing." Remmer II, 350 U.S. at 379-80 (emphasis added. Because the government never rebutted the presumption of prejudice, the Court

The state court in *Godoy,* acknowledged that Godoy established a **presumption of prejudice which is the only burden Godoy needed to carry; once he triggered the presumption, the burden shifted to the state to prove the contact was "harmless," *Remmer*, 347 U.S. at 229.** The state court never held the state to this burden; it did not require the state to make any showing of no prejudice. *Godoy* at 964. An evidentiary hearing was never held as required by *Remmer*.

## ARGUMENT

**The government failed to establish that the defendant, David He, was not prejudiced by the comments made by Juror No. 9 to the other jurors after having been sworn to hear the case.**

The *Remmer* cases, *supra,* clearly point out that any private communication, contact, tampering with a juror, directly or indirectly about a matter pending before the court is deemed **presumptively prejudicial**. Once that is established, the burden rests upon the government to establish, after notice to and hearing of the defendant, that such contact which the juror was harmless to the defendant. at 74 S. Ct. 451.

The government in this case, once Juror No. 9 was excused, objected to any questions regarding obtaining facts as to whether the jurors had heard any comments made by Juror No. 9, or whether those comments would have had an effect on being fair and impartial in determining the verdict.

Juror No. 9 was never questioned, nor was the courtroom deputy questioned, who was also present when comments were made by Juror No. 9.

From the record set out herein, neither the Court, the defendant, nor the government knew what actually transpired during the meetings in the jury room

after the jurors were sworn in or during the actual voir dire before the entire panel of jurors.

What is especially important in this case is that evidence was to be introduced by the government that the defendant was not a U.S. citizen and that he had applied for asylum which clearly would have brought to the forefront the comments made by Juror No. 9 while in the presence of other jurors. The defense requested that individual jurors be questioned on this issue, however, the government objected and the Court declined any questions related to the jurors regarding the asylum application.

It was never determined what conversations took place with the jurors and Juror No. 9, the impact on the jurors, immediately thereafter and during the trial, especially with the asylum evidence.

Any conversation heard by the jurors with Juror No. 9 with regard to his views are **presumptively prejudicial**, citing _Remmer_, 374 U.S. at 229.

The government did not attempt to determine what conversations took place between Juror No. 9 and each individual juror, nor what the jurors said to each other concerning Juror No. 9's statements.

Each juror should have been interrogated individually without the other jurors present to determine the effect of Juror No. 9's statements on each juror and whether or not they could be impartial knowing of the asylum evidence.

In the _Remmer_ cases, *supra,* the Supreme Court clearly established a defendant's entitlement to an evidentiary hearing and address allegations of improper influence on jurors.

In _United States v. Sanchez_, 2026 U.S. App. Lexis 13615; 175 4th 1134, (9th Cir. 2026) Juror No. 5 made explicit anti-Mexican statement during deliberations involving a Mexican defendant with at least four jurors hearing the biased comments.

The court held that when the presence of a racially biased juror is discovered

or a juror is found to have made a racially biased statement, but the juror is excused before the trial court accepts the verdict, the ***Remmer*** **presumption of prejudice**, applies <u>*Sanchez*</u> at 2026 U.S. App. Lexis 13615 p. 43.

The comments of Juror No. 9 raise the **presumption of prejudice**, and the government has failed to establish that any prejudice was harmless to the defendant.

It is respectfully requested that the court grant this motion for new trial.

## <u>II</u>

## THE DISTRICT COURT ERRED IN ALLOWING 404(b) EVIDENCE OF DR. ADAM RUBEN'S TESTIMONY REGARDING CANADIAN COMPANY, IND

### <u>FACTUAL BACKGROUND</u>

Doctor Adam Ruben, United States Food and Drug Administration (FDA), Consumer Safety Officer, **<u>(EXHIBIT D) – RT Transcript of Trial Day 4 (4/24/2026) Page 853:19-21</u>**, testified pursuant to 404(b) that after reviewing records of the FDA that the defendant had been affiliated with a company in Canada called IND, or International Newtech Diagnostic, that manufactured in-vitro diagnostic tests, pregnancy tests, menopause tests, drug abuse tests, and fecal occult blood tests, that had all kinds of issues, **<u>(EXHIBIT D) – RT of Trial Day 4 (4/24/2026) Page 912:5-25</u>**.

Dr. Ruben testified that based on the FDA and Health Canada records and conversation with Health Canada, he was told that they pulled all of IND's licenses in 2013 (i.e., revoking authority to sell a test), **<u>(EXHIBIT D) – RT of Trial Day 4 (4/24/2026) Page 913:5-25</u>**.

The defense objected to all of this testimony as a lack of foundation and hearsay. The Court overruled the defense's objections, **<u>(EXHIBIT D) – RT of Trial Day 4 (4/24/2026) Page 913:16-18; Page 913:24-25</u>**.

Dr. Ruben went on to testify about Health Canada records that indicated that Health Canada was concerned about tests being sold labeled as "Made in Canada" but were actually "Made in China", with a double set of books, with different information in each to import these tests, etc., **(EXHIBIT D) – RT of Trial Day 4 (4/24/2026) Page 914:1-25; 915:1-25**.

Dr. Ruben did not find anything that linked Universal Meditech Inc. (IND) to IND but found a mention of IND in inspection reports of UMI from 2018. These concerns were brought to the FDA in 2013. Dr. Ruben reviewed these reports but was not with the FDA at that time. He stated that within the records, there was an exchange in which the FDA says, "Thank you for sharing this information with us. We'll take our own actions to make sure that these tests don't come into the US." FDA then issued an import alert to make sure that IND would not import any of the products that would not be sold in Canada into the United States, **(EXHIBIT D) – RT of Trial Day 4 (4/24/2026) Page 916:1-25; Page 917:1-6**.

On cross-examination, Dr. Ruben did not know if the allegations testified to were proven after a hearing or after a court proceeding, **(EXHIBIT D) – RT of Trial Day 4 (4/24/2026) Page 917:12-25; Page 218:1-25**.

The Court asked Dr. Ruben whether the records set out IND's response, Dr. Ruben could not recall the responses, **(EXHIBIT D) – RT of Trial Day 4 (4/24/2026) Page 919:6-12**.

Upon further questioning by the Court, Dr. Ruben did not know if under Canadian law, there was a procedure or process to resolve the allegations or the withdrawal of authorization to sell the tests, **(EXHIBIT D) – RT of Trial Day 4 (4/24/2026) Page 919:13-25; Page 920:1-4**.

## STANDARD OF REVIEW

In *United States v. Alfonso*, 759 F.2d 728, 739, (9th Cir. 1985), the Court held that the review of prior similar acts is for abuse of discretion, (citations omitted).

Evidence of prior causes or wrongful conduct is potentially prejudicial and may only be admitted if:

1) It is similar enough, and close enough in time to be relevant;
2) The evidence concluding the prior crime or act is clear and convincing; and
3) The probative value of the evidence outweighs the potential prejudice to the defendant, (citations omitted) 759 F.3d at 739.

The burden of showing that such evidence meets the requirements of relevance rests within the government (citations omitted); the government "must articulate precisely the evidentiary hypothesis by which a fact of consequences may be inferred from other acts evidence," (citations omitted). at 739.

## STATEMENT OF THE LAW

In *United States v. Spencer*, 1 F.3d 742 (9th Cir. 1992), the defendant appealed his conviction for being a felon in possession of a firearm, alleging that the Court denied him the opportunity to present evidence that another individual, who owned the vehicle at issue, was found with a gun under the driver seat of the vehicle several days before the arrest in the present case.

The defendant was arrested after being seen bending forward in the passenger seat after being pulled over. When the defendant got out of the car, he had an empty shoulder holster on him. A firearm was located under the passenger seat that fit the defendant's holster. He was arrested and charged as a felon in possession of a firearm. The vehicle belonged to another person named Jim Miller, who was arrested five days after the defendant, on charges of auto theft. At the time of his arrest, police found a handgun under the driver seat of the car Miller was driving. at 742.

The district court refused to allow the defendant, Spencer, to introduce evidence of Miller's arrest and of the gun found in the car Miller had been driving. at 742.

Defendant, Spencer, argued that under Rule 404(b), the evidence of Miller's arrest should have been admitted as a prior similar act by Miller just days after Spencer was arrested in Miller's vehicle. at 744.

The *Spencer* Court stated:

> "Rule 404(b) actually establishes an independent basis for the court's exclusion of Spencer's evidence. Spencer correctly argues that he, as well as the government, may invoke the provisions of Rule 404(b). See *United States v. Perkins*, 937 F.2d 1397, 1400 (9th Cir. 1991); *United States v. McCourt*, 925 F.2d 1229, 1230-36 (9th Cir.), *cert denied*, 112 S. Ct. 121 (1991). Rule 404(b), however, is not an independent basis for admitting otherwise inadmissible evidence. Even evidence not barred under Rule 404(b) must still survive scrutiny under other Rules. E.g., *Perkins*, 937 F.2d at 1401 (evidence was excludable under Rule 403 whether or not it was admissible under Rule 404(b))."

The Court stated that Spencer's evidence did not qualify as for admission under Rule 404(b). at 745.

Spencer argued that Miller's "bad act" – hiding a gun under his car seat established the identity of the person who hid the gun under Defendant, Spencer's seat, i.e., Miller, and therefore should qualify for admission under Rule 404(b) on identity grounds. at 745.

The Court found that the characteristics of both the prior offenses and the charged offense are not in any way distinctive but are similar to numerous other crimes committed by persons other than the defendant, no inference of identity can arise. The Court found that hiding a gun under a car seat is not a distinctive crime and cannot be used to satisfy the "identity" exception to Rule 404(b). at 745.

The Court found no abuse of discretion in deciding to admit the evidence of arrest reports. at 745.

In *United States v. Evans*, 216 F.3d 80 (D.C. Cir. 2000), the defendant was convicted of distribution of illegal narcotics.

The issue on appeal involved the testimony of an agent who stated at trial

that the government "had received information" that the defendant was involved in drug trafficking. Defendant argued that this was hearsay and its admission was erroneous. at 80.

Agents met with Thomas Rose, who told them about the drug activities of Evans and referred them to his uncle, George Rose, who would assist the agents in dealing with Evans. at 80. George Rose contacted the defendant, Evans, and arranged a sale of drugs which took place. at 80.

Ten days later another sale took place. Both sales were recorded by the agents. at 82. One year later, Evans was arrested and admitted the first sale but could not remember the second sale. at 83.

At the jury trial, an agent was asked by the government how he "came about knowing Mr. Evans," – defense objected on hearsay as to what Thomas Rose told the agents, arguing that Thomas Rose was not a witness and not available for cross-examination. at 84.

The government argued that the testimony was not hearsay since it was only offered "to establish where the FBI met with George Rose and why they did what they did with George Rose." *Id.* The district court overruled the objection. at 84.

The prosecutor resumed his questioning by asking the agent why he had specifically discussed Evans with George Rose. The agent stated that he had received information that Evans was involved in drug trafficking – defense objected again, and overruled. The agent was asked by the prosecutor whether the agent's information had come from Thomas Rose, the defense objected, and this objection was sustained and the jury was told to disregard the latter. at 84.

The defense moved for a mistrial arguing that the jury could infer that Thomas Rose was the one who identified the defendant, Evans, as a drug dealer, that made it appear more likely that Evans had committed the charged acts, and that Evans would be unable to cross-examine his accuser because, "this guy was not going to be here to testify." The government argued that the testimony was not to

prove the truth of the matter asserted but rather to prove why the FBI did what they did." *Id*. The mistrial motion was denied. at 84.

On appeal, the defense argued that the agent's testimony that he "had received information that Evans was involved in drug trafficking," was inadmissible hearsay – that is, a statement, other than the one made by the defendant while testifying at the trial..., offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801 (defining hearsay): at 84.

The court went on to state: at 84

> "The problem with hearsay is that it deprives the defendant of the opportunity to cross-examine the person who uttered the statement at issue. Here, the government presented allegations of prior drug dealing, and the defendant was unable to cross-examine the person who made them. At the time of the testimony, that person – the less-than-reputable convict, Thomas Rose, was sitting in a federal correctional institution. Meanwhile in court, telling Roses's story, was the clean-cut FBI agent, Neil Darnell. Thus, Evans had no opportunity to "test the recollection and sift the conscience" of his accuser, nor could he compel him "to stand face to face with the jury in order that they [might] look at him, and judge by his demeanor upon the stand and the manner in which he [gave] his testimony whether he [was] worthy of belief." California v. Green, 399 U.S. 149, 158, 26 L. Ed. 2d 489, 90 S. Ct. 1930 (1970) quoting Mattox v. United States, 156 U.S. 237, 242-43, 39 L. Ed. 409, 15 S. Ct. 337 (1895)). Cross-examination may be the "greatest legal engine ever invented for the discovery of truth," Green, 399 U.S. at 158, but it is not of much use if there is no one to whom it can be applied."

The Court rejected the government's argument that the testimony was for the truth of the matter asserted but the Court found that the agent's testimony was certainly evidence of Defendant's prior similar conduct and noted in Footnote 6 the following: at 87.

> "Under Rule 404(b), evidence of prior crimes is admissible to prove t the defendant's state of mind, and therefore his predisposition. See

> Fed. R. Evid. 404(b); *United States v. Burkley*, 192 U.S App. D.C. 294, 591 F.2d 903, 921 (D.C. Cir. 1979). Like other facts, however, the prior crimes must themselves be proven through admissible (nonhearsay) evidence. See *Webster*, 649 F.2d at 349-50. As noted in the text, Agent Darnell's testimony could not have been used to prove that the prior crimes occurred (the truth of the matter asserted), and hence had no relevance to the question of defendant Evans' state of mind (predisposition). The most for which Darnell's testimony could have been used would have been to establish his state of mind—a fact not relevant to the state of mind of the defendant. See *id.*"

The court concluded:

> "…that the admission of Special Agent Darnell's testimony was error under the Federal Rules of Evidence: under Rules 801 and 802 because the jury was effectively told that the testimony could be used for its truth, and under Rule 403 because the probative value of the only relevant nonhearsay purpose—general background—was substantially outweighed by the danger of unfair prejudice. at 88."

Since the defendant admitted to having participated in the charged drug transactions, the erroneous admission of the Agent's testimony did not contribute to the result in this case was considered harmless. at 90.

## ARGUMENT

### The district court erred in allowing 404(b) evidence of Dr. Adam Ruben's testimony regarding Canadian company, IND

The Rule 404(b) evidence from Dr. Adam Ruben was not based on clear and convincing evidence as required in *United States v. Alfonso*, 759 F.2d 728, 739.

Furthermore, the testimony of Dr. Ruben was based upon hearsay regarding the Canadian activities of IND since his knowledge came from reports before he was even employed by the FDA. He testified that he was unfamiliar with the due process with Health Canada as to how allegations and whether these allegations

were resolved.

The defense in this case, as in _United States v. Evans,_ 216 F.3d 80 (D.C. Cir. 2000), was prohibited from cross-examining the person or persons who gave the information to Dr. Ruben. Dr. Ruben's testimony was based on hearsay and should not have been allowed. Dr. Ruben's testimony regarding IND and Health Canada was not harmless in any sense and highly prejudicial to the defense. There was no opportunity to cross-examine anyone regarding the basis of his testimony regarding IND and Health Canada.

Further, the testimony of Dr. Ruben regarding IND and Health Canada involved a Canadian company not involved in COVID-19 kits. All products of UMI other than the COVID-19 kits were permitted to be sold in the United States as were the products from IND in Canada, none of which were COVID-19 kits.

The similarity requirement of Rule 404(b) evidence as in _United States v. Spencer_, 1 F.3d 742, (9th Cir. 1992), did not exist when the defense was not being allowed to introduce the Rule 404(b) testimony regarding another incident with Miller possessing a firearm in the same vehicle on another occasion. In this case, IND was producing products in Canada that IND had a license to produce. The facts in Canada were not the same. The testimony of Dr. Ruben regarding IND and Health Canada was not proper 404(b) evidence and should have been excluded.

## CONCLUSION

It is respectfully requested that Defendant's Motion for New Trial Pursuant to Rule 33 of the Federal Rules of Criminal Procedure, be granted for the reasons mentioned herein.

Respectfully submitted,

DATED: August 31, 2026

*/s/ Anthony P. Capozzi.*
ANTHONY P. CAPOZZI, Attorney for
JIA BEI ZHU, aka Jesse Zhu, Qiang He,
David He